In re Marshall S. STERMAN, Debtor.

Xerox Financial Services Life Insurance Company and Van Kampen Merritt, Inc., Plaintiffs,

v.

Marshall S. Sterman and J. Daniel Hoffman, Defendants.

Xerox Financial Services Life Insurance Company and Van Kampen Merritt, Inc., Plaintiffs,

v.

Marshall S. Sterman, Defendant,

and

Dibo Attar, Esther Attar, J. Daniel Hoffman, and Davstar II Managed Investments Corp. N.V., Reach and Apply Defendants.

Nos. Civ.A. 97–11887–GAO,
Civ.A. 92–11029–GAO.

United States District Court,
D. Massachusetts.

Nov. 9, 1999.

Richard A. Oetheimer, Goodwin, Procter & Hoar, Boston, MA, for Debtor.

Daniel S. Savrin, Bingham, Dana & Gould, Boston, MA, for Plaintiffs.

John G. Loughnane, Goodwin, Procter & Hoar, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Pursuant to prior judgments entered against him, defendant Marshall S. Sterman ("Sterman") owes the plaintiffs Xerox Financial Services Life Insurance Company and Van Kampen Merritt, Inc. ("Xerox/VKM") a combined total of more than $6 million. The plaintiffs' efforts at collection have been unsuccessful, and as a result this contentious litigation has lasted more than seven years. On November 18, 1996, Sterman filed a Chapter 7 bankruptcy petition. Xerox/VKM filed a complaint in the bankruptcy proceedings seeking to deny Sterman a discharge under section 727(a) of the Bankruptcy Code, 11 U.S.C. § 727(a). On the motion of Xerox/VKM, this Court withdrew the reference of the complaint and consolidated the matter with the pending post-judgment collection proceedings. The plaintiffs have also moved, in the proceedings pending in this Court since 1992, to reach and apply certain shares of stock in companies related to Sterman that had been transferred, putatively by foreclosure sales, to the reach and apply defendants, Esther Attar, J. Daniel Hoffman, and Davstar II Managed Investments Corporation N.V. ("Davstar II"), with the active cooperation of the other reach and apply defendant, Dibo Attar.

Both issues were tried to the Court sitting without a jury. Upon consideration of the evidence and the arguments of the parties, the Court makes the following findings of fact and rulings of law.

## I. General Findings

### A. Marshall Sterman and His Companies

Marshall Sterman is an experienced businessman who has been essentially self-employed as an entrepreneur, investment banker, and venture capitalist for many years. He has conducted his business affairs through a variety of entities controlled by him, including the Mayflower Group, Ltd., Mayflower Partners, M.S. Sterman and Associates, The Sterman Company, Pilgrim Financial Services, and the State Street Group, Inc., sometimes with "partners," sometimes on his own. One of his "partners" in the Mayflower Group is Barry Hoffman, his first cousin. Barry Hoffman's son, Daniel Hoffman, figures in the events at issue in ways to be explained later. The other "partners" in the Mayflower Group originally were Paul Chrestensen and Lester Grant, who was deceased at the time of the relevant events and whose interest was held (so far as appears, passively) by his widow, Faith Grant.

The interrelationships among Sterman's companies were complex. For present purposes, the most important ones were these: Mayflower Group owned a 75% interest in Pilgrim Financial Services, which company in turn owned 100% of a company called Allied Programs Corp. Allied Programs held interests in some other compa-

nies engaged, in broad terms, in running private correctional programs, including a facility located in Brush, Colorado. Specifically, Allied Programs owned a 90% interest in Rebound Corp., which operated and managed the Brush facility under contract with various states. The Brush facility's physical plant and real estate were owned by the High Plains Limited Partnership. Allied Programs was the general partner of the High Plains Limited Partnership, with a 25% stake. The limited partner, with a 75% interest, was a company called Allied First Class Partners, Inc. ("AFCP"). The shareholders of AFCP, before the transactions described below, included Sterman, Lane Hoffman (Barry's wife), Faith Grant, Chrestensen and others. Rebound Corp., the operator of the Brush facility, paid rent to the owner of the real estate, High Plains Limited Partnership. Through Allied Programs, the Mayflower Group—and therefore Sterman—had a significant financial interest in both the owner (High Plains) and the operator (Rebound) of the Brush facility. Sterman also had a separate interest in High Plains through his ownership of 11.4% of the outstanding shares of its limited partner, AFCP.

A chart of the interrelationships, received in evidence as Exhibit 271, is attached to this memorandum as Appendix A.

### B. Sterman's Relatives and Friends

In addition to Sterman's cousins, Barry and Daniel Hoffman, there are other relatives and friends of Sterman who figure in the events at issue.

Sterman's wife is Dorothy Sterman ("Dorothy"). Throughout Sterman's business career, Dorothy has been at home, not directly engaged in business affairs. Title to the Sterman residence in Beverly, Massachusetts, is in her name, although Sterman has seen to the payment of the mortgage and any necessary other business with the mortgagee bank, as well as the payment of real estate taxes on the property.

Dr. Joel Glovsky is a longtime friend of Sterman's. Sterman has described him as his "closest personal friend." Glovsky lent Sterman money from time to time, secured by a pledge of certain assets. Of especial importance to the issues presented in this case, Sterman pledged as security for his debt to Glovsky 300 shares of the stock of the Mayflower Group and 1200 shares of the stock of AFCP, in each case the full extent of his holdings in the company. Sterman and Glovsky also participated in some of the same business ventures. For example, both Dr. Glovsky and Sterman were hired as consultants by a company called Omega Orthodontics, Inc., receiving their compensation in shares of Omega stock.

Dibo Attar is also a business investor whom Sterman met in connection with some investments they had each made. For example, Attar and Sterman had served together on the board of directors of KTI, Inc. for several years. Attar also apparently conducted business through a number of entities. Attar was a consultant to Davstar II and able to direct its investments. Attar's wife is Esther Attar, who, like Dorothy Sterman, did not take an active role in her husband's business affairs.

### C. The Consent Judgment and the Subsequent Injunctions

Consent judgments in favor of Xerox/VKM and against Sterman were entered in mid–1993. In August 1993, Xerox/VKM began serving trustee summonses on the various entities through which Sterman conducted his business affairs, including High Plains Limited Partnership, AFCP, Allied Programs, M.S. Sterman & Associates, and the Mayflower Group. In December 1993, the plaintiffs moved for an injunction to reach and apply Sterman's interests in those entities. A temporary restraining order was granted and entered, on Jan-

uary 6, 1994, this Court (Zobel, J.) entered an "Agreed Injunction and Order of Payment and Dissolution." *See* Docket No. 76. Among other things the Agreed Injunction prohibited Sterman and anyone acting "in participation or concert with him" from assigning, encumbering, selling, transferring or otherwise disposing of any property interest Sterman had in High Plains, AFCP, Allied Programs, M.S. Sterman, or Mayflower Group. The injunction also directed the named entities "to continue making income payments ... to Sterman consistent in amount and frequency with past practice, including but not limited to salary, shareholder distributions and dividends, consulting fees and management fees." The injunction established an escrow fund into which all income Sterman received from any of the named entities would be deposited and from which Sterman was permitted a $10,000 monthly allowance for living expenses.

By an order entered February 25, 1994 (Docket No. 129), the Court continued the injunction in effect "until further order" and extended its scope to reach Sterman's interests in a number of other companies, including The Sterman Company; KTI Realty Limited, LP; KTI Holdings, Inc.; KTI Realty Trust; Microfluidics; Pilgrim Financial Services; Mayflower Partners, Inc.; Mayflower Venture Corporation; Rebound Colorado Corporation; and several others not relevant here. In entering the February 25 order, the Court (again Zobel, J.) noted, "The record is clear that [Sterman] has used a variety of means to obstruct collection of this debt."

By mid–1995, the plaintiffs had become convinced that Sterman was not abiding by the injunctions, and they moved, among other things, for a finding of contempt and a reduction in Sterman's living expense allowance. After an evidentiary hearing, this Court found Sterman in contempt of the injunctions on the basis of several different evasions that were convincingly proved by the evidence. This Court said:

> In sum, Sterman has orchestrated a mind-boggling array of transactions among several corporations under his control in an effort to keep his various business undertakings afloat and to avoid his creditors (or at least those creditors he does not like). Rarely has a more tangled web been woven. The evidence is overwhelmingly clear and convincing that Sterman has violated this Court's orders.

*Xerox Financial v. Sterman,* No. 92–11029–GAO at 9 (D.Mass. filed Aug. 9, 1996) (Memorandum and Order).

The Court reduced Sterman's living expense allowance and scheduled a hearing to consider what further sanctions might be imposed for the contempt. Before the hearing was held, Sterman filed his petition in bankruptcy, interrupting the Court's consideration of the matter.

## II. *Conclusions of Law and Specific Supporting Findings*

As noted above, there are two separate complaints brought by the plaintiffs, consolidated for hearing, that are to be resolved. One is the complaint, initially brought within the bankruptcy case but withdrawn to be heard by this Court in the first instance, to deny Sterman a discharge in bankruptcy under 11 U.S.C. § 727(a). The other is the complaint to reach and apply shares of stock that the plaintiffs claim Sterman improperly caused to be transferred to other persons.

### A. *Denial of a Discharge*

#### 1. *General Considerations*

The statutory right to a discharge in bankruptcy is to be "construed liberally in favor of the debtor" and strictly against the objecting creditor. *In re Tully,* 818 F.2d 106, 110 (1st Cir.1987); *see also In re Bajgar,* 104 F.3d 495, 498 n. 1 (1st Cir.1997); 6 *Collier on Bankruptcy* ¶ 727.01[4] at 727–12 (15th ed. rev.1999).

The reasons for denial of a discharge "must be real and substantial, not merely technical and conjectural." *In re Tully,* 818 F.2d at 110 (internal quotations and citations omitted).

However, despite this preference for discharges, there are limitations on a debtor's "right" to a discharge. There must be, for example, some way of ensuring that "those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Id.* So, "[w]hile the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice." *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128, 1131 (9th Cir.1971).

■ Under section 727(a) of the Bankruptcy Code, the burden of persuasion rests with the party opposing the discharge. Fed.R.Bankr.P. 4005; *In re Burgess,* 955 F.2d 134, 136 (1st Cir.1992), *abrogated on other grounds Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The objecting party must prove each element of its objection to a discharge by a preponderance of the evidence. *See, e.g., In re Adams,* 31 F.3d 389, 394 (6th Cir.1994); *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249–50 n. 17 (4th Cir.1994); *In re Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992); *In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991); *cf. Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (applying a preponderance of the evidence standard to a creditor seeking to prove an exception to discharge under § 523(a) of the Bankruptcy Code).

### 2. *11 U.S.C. § 727(a)(2)(A)*

■ A debtor may be denied a discharge under § 727(a)(2)(A) if the creditor proves by a preponderance of the evidence that the debtor (1) with actual intent to hinder, delay or defraud a creditor (2) transferred, removed, destroyed, mutilated or concealed his property, or permitted another to do so (3) within one year before the date of the filing of the petition for bankruptcy. 11 U.S.C. § 727(a)(2)(A). Moreover, a concealment of a property interest that occurred more than one year prior to the filing may still provide a basis for denial of discharge if it continues within the year preceding the filing. *See, e.g., Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993); *In re Olivier,* 819 F.2d 550, 554–55 (5th Cir.1987); *In re Sicari,* 187 B.R. 861, 875 (Bankr.S.D.N.Y.1994); 6 *Collier on Bankruptcy* ¶ 727.02[2] at 727–14 (15th ed. rev.1999).

■ The objecting creditor must prove that the debtor acted with an actual intent to hinder, delay or defraud. *In re Wines,* 997 F.2d 852, 856 (11th Cir.1993); *In re Moreno,* 892 F.2d 417, 419 (5th Cir. 1990). Since actual intent will rarely be capable of proof by direct evidence, circumstantial evidence of intent may suffice. *See In re Varrasso,* 37 F.3d 760, 764 (1st Cir.1994); *see also In re Krehl,* 86 F.3d 737, 743 (7th Cir.1996); *In re Smiley,* 864 F.2d 562, 566 (7th Cir.1989); *In re Devers,* 759 F.2d 751, 753 (9th Cir.1985). Bankruptcy judges have sometimes inferred actual intent from the existence of "badges of fraud," for which no adequate rebuttal or explanation is evident. *See, e.g., In re Silverstein,* 151 B.R. 657, 660–61 (Bankr. E.D.N.Y.1993); *In re Penner,* 107 B.R. 171, 175–76 (Bankr.N.D.Ind.1989); *In re Titus,* 75 B.R. 256, 259 (Bankr.W.D.Mo. 1985). Some of the "badges of fraud" include (1) the lack or inadequacy of consideration for the property transferred; (2) the existence of a family, friendship or other relationship between the transferor and transferee; (3) the transferor's retention of the benefits or possession of the transferred property; (4) the chronology or timing of the particular transfer under question. *See In re Penner,* 107 B.R. at 175–76. The concurrence of several telltale "badges of fraud" will support a finding that the debtor acted with the necessary fraudulent intent. *Id.* at 176. As with other aspects of the evaluation of

evidence, determinations concerning fraudulent intent are questions of fact that " 'depend[ ] largely upon an assessment of the credibility and demeanor of the debtor....' " *In re Burgess,* 955 F.2d at 137 (quoting *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 252 (4th Cir.1987)).

■ **Conclusion:** Sterman transferred or concealed property interests with the actual intent to hinder, delay or defraud Xerox/VKM within a year prior to the filing of his petition in bankruptcy, and for that reason he ought to be denied the benefit of a discharge.

**Findings:** On the basis of the credible evidence, the Court makes the following findings:

*a. Foreclosure Sales of the Mayflower Group/AFCP Stock.*

As noted earlier, Sterman held 300 shares, or 25%, of the stock of Mayflower Group and 1200 shares, or 11.4%, of the stock of AFCP. In 1990, he pledged these shares, along with other property, as security for a debt he owed to his close friend Glovsky. At the time he pledged the stock, he owed Glovsky over $100,000. The value of the property he pledged to secure the debt approached $2 million. In other words, Glovsky was vastly over-secured. This was not a disadvantage to Sterman, however. On the contrary, it would prove to be a useful circumstance to have Glovsky's interest senior to the interests of less friendly creditors.

In the Spring of 1995, the financial pressure on Sterman increased. In early March, the Court of Appeals affirmed the plaintiffs' judgment against Sterman. *See Xerox Financial Serv. Life Ins. Co. v. High Plains Ltd. Partnership,* 44 F.3d 1033 (1st Cir.1995). About a month later, the plaintiffs filed a motion in this action seeking to establish an equitable interest in the Sterman residence and to reach the asset and apply it to reduce the debt. The plaintiffs' argument was, in brief, that Sterman was the true owner of the property, who had supplied all the consideration for its purchase and upkeep, despite the fact that legal title was held solely by his wife. In addition, in April, the Internal Revenue Service recorded a federal tax lien against Sterman and his wife for three tax years in a total amount exceeding $50,000. These events, as well as the continuing restrictions imposed by the Court's injunctions, increased the financial pressure Sterman was feeling.

But there was also a ray of hope glistening on the horizon. Around this time, private companies that managed correctional facilities or operated related programs were attracting the interest of potential investors. In light of this development, the Brush facility—through Rebound or High Plains or both—began to look like it might produce real value for its investors, including Sterman. For instance, from 1994 to 1995 both revenues and net income rose substantially for Rebound and its related company Rebound Programs. As early as the latter part of 1994, Sterman had begun to pursue the possibility of a public offering of Rebound stock. From late 1994 through 1995 and into the first half of 1996, Sterman was in negotiation with a number of different potential buyers or merger partners. For example, in the Spring of 1995, Sterman was engaged in discussions with Cornell Cox, Inc. about that company's proposal to acquire Rebound Corp. by merger. From Sterman's contemporaneous notes, it appears he was suggesting to Cornell Cox that Rebound had a value upwards of $20 million.

In approximately June 1995, Sterman had discussions with Community Psychiatric Centers in approximately June 1995. Contemporaneous notes indicate that he was proposing the value of Rebound was about $27.5 million. In early 1996, J.H. Whitney & Co. sent Sterman, as president of the Mayflower Group, a proposal to purchase 90% of the ownership of the combination of High Plains, Rebound, and Re-

bound Programs. The proposal valued the acquired businesses at $35.8 million. In March 1996, Sterman, as "representative" of Rebound and Rebound Programs, received from Wackenhut Corrections Corporation a proposal to purchase all the outstanding shares of the Rebound entities for $33 million. None of the proposals came to fulfillment, perhaps in large part because the financial condition of the companies did not stand up to rigorous examination, but also because in general the private corrections bubble was beginning to fizzle.[1]

In May 1995, just as the pressure on Sterman was increasing from the plaintiffs and the IRS, Sterman's friend, Glovsky, demanded payment on Sterman's indebtedness to him. Sterman offered to find a buyer for some of the collateral Glovsky was holding for the debt, offering to pay Glovsky from the proceeds of the sale. At the time, of course, the Court's injunctions prohibited Sterman from disposing of any of his assets, including that stock. Therefore, the transaction could not proceed as a sale by Sterman; it was necessary to structure it as a foreclosure by Glovsky. The injunctions did not explicitly forbid Glovsky from foreclosing his security in-

terest in the shares.[2] Accordingly, Glovsky retained an attorney to commence the foreclosure process. Through his lawyer he gave notice of his intent to foreclose to a number of Sterman's other creditors, including the IRS and the Boston Private Bank, but not to the plaintiffs, the creditors to whom Sterman owed the most by far. Glovsky knew of Sterman's debt to the plaintiffs.[3]

Sterman took an active role in bringing about the foreclosure sale. Specifically, he arranged with his friend Dibo Attar to have Davstar II purchase the Mayflower Group shares for $50,000 at the private sale. Although the sale was meant to look like an arm's length transaction, it was not. The buyer, Davstar II, conducted no investigation into the value of the shares, and there appears to have been no sound investment reason for Davstar II to purchase such shares. From all the circumstances, the inference is inescapable that Sterman persuaded Attar to purchase the shares as a way of helping him in his financial difficulties. Sterman handled all the arrangements.[4]

This was not the first time that Glovsky had moved to foreclose his security inter-

---

1. Because of the shakiness of the valuations, the proposals are not entirely reliable indicators of the true value of the Rebound enterprise or, by extension, Sterman's investment in it. Nevertheless, the evidence is reliable to show the values that Sterman himself was proposing to potential purchasers of the companies, and in this respect illuminates the question, addressed below, whether he properly valued his shares of Mayflower Group and AFCP.

2. The second injunction did prohibit "those persons or entities acting in participation or concert with [Sterman], who receive actual notice of this Order by personal service or otherwise" from assisting Sterman's transfer of assets. See Xerox Financial v. Sterman, No. 92–11029–Z at 2 (D.Mass. filed Feb. 25, 1994) (Memorandum and Order).

3. As a foreclosing secured creditor, Glovsky was legally required to give notice to other secured creditors, not to unsecured creditors. The absence of notice to the plaintiffs is noted not because it represents any legal defect, but

because it is one of the many factual circumstances that lead to an understanding of Sterman's plans and motivations in the transactions, as well as the assistance given him by his friends.

4. In his deposition, offered in evidence at trial, Glovsky testified that he was not aware of anyone, including his lawyer, conducting negotiations with the buyer about the stock. Glovsky Dep. at 16 (Aug. 1, 1996). He further testified as follows:

> Q. Okay. So it was Mr. Sterman's idea to sell these shares?
> A. That's correct. To sell shares, whatever. I didn't—I told him I wanted the money.
> Q. And Mr. Sterman said, well, I'll sell—
> A. No, he didn't say that. He said I'll try and find a buyer for some of the collateral you're holding and get you the money. *Id.* at 27.

est. A few years earlier, when Sterman was being pressured by the Boston Private Bank, Glovsky attempted a foreclosure, but the bank had an injunction against Sterman's alienation of assets and it was able to obtain an order that the proceeds of any foreclosure sale be held in escrow pending adjudication of the creditors' respective entitlements to the proceeds. After the escrow order, Glovsky abandoned the foreclosure proceedings.

Nor was it the first time that Attar had helped Sterman out by buying an asset from him. In early February 1995, Sterman arranged a sale of 174,439 shares of stock of KTI, Inc. held by his company, M.S. Sterman and Associates, to The Bridge Fund, N.V. for the sum of $150,000, or about 86 cents per share. Dibo Attar controlled The Bridge Fund's decision. At the time, both Sterman and Attar were members of the Board of Directors of KTI, Inc., and both knew that the company's stock would shortly begin public trading. After the sale, on February 9, the stock began trading on the NASDAQ exchange at a price of $1.75 per share. At the time of the sale, Sterman was enjoined by the Court's second injunction from selling or transferring "any property, right title, interest, or asset of any kind held by or due to" him, including any interest in (among other entities) M.S. Sterman and Associ-

ates, KTI Realty Limited, LP, KTI Holdings, Inc., and KTI Realty Trust.[5] Mem. and Order at 2 (Feb. 24, 1994). The Court has previously found the transaction to be one of the bases for the adjudication of contempt against Sterman. *See* Mem. and Order at 6, 8–9 (Aug. 9, 1996).

Shortly after the purported foreclosure sale of the Mayflower Group stock, Sterman arranged a similar foreclosure by Glovsky of his interest in Sterman's 1200 shares of AFCP stock. The transaction was substantially similar to the prior one. Glovsky gave notice of the intended private foreclosure sale to other creditors, but not to the plaintiffs. Again, Sterman arranged the sale with Dibo Attar and set the price, this time $250,000.[6] Attar originally planned to have an entity called Wellington Corporation, N.V. purchase the stock, but for technical reasons that could not legally be done. Accordingly, Sterman, Attar and Barry Hoffman agreed that the shares would be purchased in the names of Esther Attar, Dibo's wife, and Daniel Hoffman, Barry's son. Dibo Attar furnished half the total price, and Barry Hoffman furnished the other half. Neither Esther Attar nor Daniel Hoffman participated in any way in the transaction. Neither was, either in law or in fact, a good faith purchaser, but rather only a

---

**5.** It is not clear whether "KTI, Inc." was distinct from these other "KTI" interests. It would be consistent with Sterman's manipulations for him to have rationalized the sale on the ground that "KTI, Inc." was not expressly named, so he was free, under the injunction, to sell his shares of its stock. It is clear, however, that the scope of the injunction was not limited to the entities specifically enumerated and that it reached "*any* property, right, title, interest, or asset of *any* kind" held by Sterman. Stock owned by his alter ego corporations, such as M.S. Sterman and Associates, was an interest owned by him for purposes of the injunction.

**6.** Glovsky testified:

 Q. ... You did understand that when you asked Mr. Sterman for additional money that he was going to try to find a buyer for the Allied First Class Partners stock?

 A. No, I did not understand that. I had some other things that were pledged to me or whatever, and I didn't understand anything except that he was going to get me the money, try to get me the money.

 Q. At some point you became aware that that stock was going to be sold; correct?

 A. Yeah. Sure.

 \*\*\*

 Q. How was the money paid?

 A. It was paid as the result of the sale of Allied First Class Partners stock as you well know.

 Q. That was a sale where Mr. Sterman found the buyer?

 A. That's correct.

 Q. And after Mr. Sterman found a buyer, you wanted a private sale done?

 A. I didn't care what was done....All I cared was that I got my money.

"straw" nominated without her or his knowledge in order to facilitate the transaction.[7] As with the purchase of the Mayflower Group stock, the purchasers conducted no evaluation or investigation of the value of the investment, but simply agreed to go along with the price that Sterman suggested. Except at the most superficial level, the sale had none of the hallmarks of a good faith, arm's length transaction.

The proceeds of the sale of the Mayflower Group stock went to Glovsky to reduce Sterman's debt. The proceeds of the sale of the AFCP stock were distributed among Glovsky, the Boston Private Bank, and the IRS, in each case reducing Sterman's indebtedness.

It is difficult on the evidence to assess the true value of the shares of Mayflower Group or AFCP at the time of the sales. It is clear, however, that at the time Sterman himself was projecting their value to be considerably in excess of the sales prices. During this period, he was actively pursuing the possibility of selling the Rebound interests, including the Brush facility, which were substantially owned ultimately by Mayflower Group and AFCP. Sterman's contemporaneous notes show computations in which he placed the value to him of a sale of the Rebound interests in the range of several million dollars. Of course, the prospect of selling the Rebound interests was highly contingent, and his projections are not necessarily an indication of the actual value of the Mayflower Group and AFCP stock. Nonetheless, the considerable disparity between Sterman's own projections of the value of his stock and the prices he set for the "foreclosure" sales is a further indication that the sales were inauthentic and contrived, rather than genuine.

The sale of the AFCP shares occurred at the end of November 1995, within one year prior to the filing of Sterman's bankruptcy petition, and it may thus serve as a basis for a denial of a discharge under section 727(a)(2)(A). The sale of the Mayflower Group stock occurred at the end of August 1995, more than a year prior to the filing of the petition. The sale of the Mayflower Group stock falls outside the relevant statutory period and by itself does not qualify as a basis for denial of a discharge. However, the transaction may still be considered in determining whether denial of a discharge is justified if it was part of a concealment of property that continued into the relevant time period. *See Rosen*, 996 F.2d at 1531; *In re Olivier*, 819 F.2d at 554–55. *See also, In re Charette*, 148 B.R. 94 (Bankr.D.Mass.1992). *But see, In re Bottone*, 209 B.R. 257 (Bankr.D.Mass.1997). As the next section explains, Sterman continued to conceal an actual interest in Mayflower Group during the year prior to the filing of the petition.

 b. *Sterman's Continuing Interest in Mayflower Group and AFCP Despite the Sales.*

Despite the purported transfers of his entire interests in Mayflower Group and AFCP, Sterman has continued to act as if he still owns those shares. The evidence disclosed several instances of his causing compensation for his business consulting, including directors' fees, to be paid to Mayflower Group, rather to himself personally. It must be remembered that he is bound under the Court's injunctions to deposit his income into an escrow account for the benefit of the plaintiffs. He thus has an incentive not to receive the consulting or directors' fees personally. Instead, he has them paid to the Mayflower Group and other of his entities. For instance, in 1996 for consulting services that Sterman personally provided, PracSys Corporation paid Mayflower Group a cash fee and,

---

**7.** Daniel Hoffman testified that he knew of the transaction in advance, but I do not believe his testimony in this respect. It may be noted that this was not the only occasion in which Daniel has been used by his father and Sterman to facilitate transactions. Daniel was named as the "president" of one of Sterman's shells, State Street Group, Inc., but he did not know of that fact until the time of his deposition by the plaintiffs in this case.

later, granted Mayflower Group 37,500 shares of PracSys common stock. It was not unusual for Sterman to receive common stock in his client companies as compensation for his consulting work. Also in 1996, Amnet Technologies, Inc., granted stock options to its five outside directors, one of whom was Sterman. He directed that the options be granted to Mayflower Group. Around the same time, Sterman caused Mayflower Group to enter into a consulting agreement with Omega Orthodontics, Inc., pursuant to which Mayflower Group would be paid 225,000 shares of Omega common stock.[8] Sterman was a director of a company called Epigen, Inc. Prior to 1994, Epigen paid directors' fees directly to Sterman personally. In June 1996, Epigen distributed as a "bonus" 200,000 shares of its stock to "the Mayflower Group, a corporation controlled by Marshall Sterman." Ex. 4 at 5.

Although there were other shareholders of Mayflower Group, only Sterman performed any personal services for the company. He took no regular salary. Even before the injunctions in this case were entered, Sterman apparently took his compensation in ways other than through a regular salary, mostly by means of distributions of various sorts from one or another of his companies. Thus, if he were to be believed, despite the sale of his entire ownership interest in Mayflower Group, he has worked solely to enhance the value of the company for its other shareholders and has himself taken no compensation—not in salary, not in stock—for his consulting work. That is simply not believable. On the other hand, if Sterman has retained his interest in Mayflower Group by agreement (tacit or otherwise) with Dibo Attar, then

it is understandable that he would work to increase the assets and value of Mayflower Group while avoiding any receipt of compensation personally, because that income would be clearly subject to the Court's orders and would have to be escrowed.

Sterman's conduct after the "foreclosure" of the AFCP stock was also consistent with his having retained an ownership interest in that stock. On April 5, 1996, Sterman's assistant sent to the IRS a check in the sum of $26,220 to be credited against the amount owed by Sterman and his wife. The check, dated April 4, 1996, was drawn on the account of AFCP and signed by Sterman. Sterman thus caused AFCP to make a payment on account of his personal tax obligations even though at the time the payment was made he was supposedly no longer a shareholder of AFCP and not entitled to any distributions from it. His explanation was that the $26,220 represented a delayed payment of a dividend that had been declared on November 15, 1995, conveniently just before the "foreclosure" sale. He pointed to an entry in the notebook diary that he personally kept about a meeting of the AFCP board of directors on November 15, 1995, at which the dividend had been declared. His explanation is not believable. The note about what the directors supposedly did in November 1995 is located in Sterman's notebook pages for April 1996, when the payment was made, rather than, as might reasonably be expected, in the pages for November 1995, when the meeting was supposed to have occurred. The note is transparently an attempt to backdate the payment to make it appear that it was authorized while Sterman was still a shareholder of record.[9] The conclusion is ines-

---

8. By the same instrument, Omega also retained Glovsky as a consultant for the same compensation.

9. The note indicated that the board of AFCP declared a distribution of $230,000. Sterman's ownership interest in AFCP, 11.4%, entitled him to $26,220. The other shareholders of AFCP as of November 1995 also received distributions in April in amounts ap-

propriate to their respective percentage of ownership. Sterman explained that the distributions were not made in November when authorized because the purpose was to give the investors cash to help with their April tax payments, and if they were given the money too early they would imprudently dissipate it and not have it available when they needed it in April. The explanation is ludicrous.

capable that the note of the directors' meeting is a fake, and it shows that Sterman was consciously trying to conceal his continuing interest in AFCP.

Sterman's notebook contains another entry made in late April 1996 in which he estimates what each of the shareholders of AFCP would receive in the event that the Wackenhut offer to purchase the Rebound interests were to be completed. Though he was not then a shareholder of record, his note shows that he estimated that he would receive $2.55 million from an acquisition of the Rebound interests by Wackenhut. The note consists of a list of initials, each pair consistent with the name of a shareholder, with the adjacent dollar amount apparently consistent with each particular shareholder's respective percentage of ownership. One of the pairs of initials is "M.S."—clearly, Marshall Sterman. There is no reference to either Esther Attar or Daniel Hoffman, who were supposed to be shareholders at the time.

It is clear that after the purported sales of the Mayflower Group and AFCP stock, Sterman acted as if he continued to own the shares. There was no direct evidence of an express agreement by the supposed transferees that they would hold the stock for Sterman's benefit; the participants have hewed to a consistent, if fabulous, tale. But the inference from all the circumstantial evidence is overpowering that the purported foreclosures were not genuine transactions, but frauds.

The "badges of fraud" are present. The "foreclosure" sales were conveniently timed by and orchestrated by Sterman with the cooperation of close friend, Glovsky, and were consummated with other close friends and associates. The prices paid were inadequate when judged in comparison with the values that Sterman was himself assigning to those interests in other contexts in the same time period. After the transfers, Sterman continued to act as

if he owned the shares that had supposedly been foreclosed and sold. The Court finds that Sterman was, as the plaintiffs have alleged, merely "parking" his stock in friendly hands until it would be safe to retrieve it—such as after a discharge in bankruptcy.

### c. *Other Deceptive Transactions.*

Sterman was engaged to perform consulting services in 1996 for the Ray Dirks Research Group ("Ray Dirks") for a total fee of $175,000. In July 1996, Sterman directed that the fee be paid in two installments, consisting of a wire transfer of $100,000 to the Mayflower Group and a check for $75,000 to the Sterman Company. Sterman caused the check to be endorsed over to the City of Beverly, Massachusetts, to pay real estate taxes due on the Sterman residence. The plaintiffs have pointed out that by endorsing the check over, rather than depositing it and then writing a second check to the City against it, Sterman was able to keep the transaction from appearing in the Sterman Company's books. Sterman thus concealed this transaction and property interest as well, which occurred within the year prior to the filing of his petition.

The way he handled the Ray Dirks payments illustrates how Sterman typically structured transactions freely through one entity or another as it suited his purpose at any given time. There are other examples. In April 1995, in need of money to pay taxes but subject to the Court's injunctions, Sterman caused Allied Programs Corp. to transfer $5,000 to State Street Group, Inc. He then caused State Street Group to purchase a treasurer's check from a bank, which he sent to the IRS. It should be noted that State Street Group was not named in the Court's injunctions because the plaintiffs had not yet learned of its existence as a Sterman entity.[10]

---

**10.** In a deposition given in April 1995, Sterman deliberately misled the plaintiffs about his connection with State Street Group, pretending that Daniel Hoffman was the only person involved in State Street. As noted earlier, Hoffman did not even know he was

Sterman used State Street Group for other transactions. In December 1994, Sterman caused State Street Group to loan money to the Sterman Company. In March 1995, Sterman had State Street Group issue a check for $3,800 to the Kernwood Country Club to be applied to Sterman's personal account. Despite these transactions, Sterman did not disclose any affiliation with State Street Group in his original Statement of Financial Affairs filed in his bankruptcy case. He amended the Statement to include State Street Group only after it became clear to him that the plaintiffs had discovered the connection.

Sterman also used an entity known as Mayflower Partners to hide transactions. For example, in a note in his notebook for July 1994, he wrote, "Have payments from MFG [Mayflower Group] put in MF Ptrs [Mayflower Partners] when they come in and work out of that acct!!" Ex. 216. Just a few days after he made this note, KTI, Inc. wired $1,667 to the Mayflower Partners bank account. The money represented a director's fee for Sterman. Prior to this, KTI directors' fees had been paid either to the Mayflower Group or to the Sterman Company, but never to Mayflower Partners. Two days after the fee was received by Mayflower Partners, Sterman drew a check on the Mayflower Partners account in the amount of $2,000, payable to the Sterman Company. On another occasion, Sterman received a fee for testifying as an expert witness in a Massachusetts state court action. The lawyer who had hired him sent him a check made payable to "Marshall Sterman." Sterman returned the check and asked that a new one be issued to Mayflower Partners, which the lawyer did. Sterman then deposited the second check into the Mayflower Partners account, evading the requirement that such income be put in the escrow account. Sterman also caused Mayflower Partners, like State Street Group, to make a payment on his behalf to the Kernwood Country Club. And as with State Street Group, Sterman did not disclose his affiliation with Mayflower Partners on his original Statement of Financial Affairs, but disclosed it in the Amended Statement only after it had otherwise been discovered.

As these transactions illustrate, from the time the Court's injunctions were entered through the filing of his bankruptcy petition, Sterman has persistently used a variety of techniques and manipulations to conceal the identity and extent of his property interests.

3. *11 U.S.C. § 727(a)(4)(A)*

Section 727(a)(4)(A) authorizes denying a discharge to a debtor who knowingly and fraudulently makes a false oath of a fact material to the bankruptcy case. *In re Tully*, 818 F.2d at 110. A fact is material if it is "pertinent to the discovery of assets, including the history of a bankrupt's financial transactions." *In re Mascolo*, 505 F.2d 274, 277 (1st Cir.1974); *see also In re Sapru*, 127 B.R. 306, 316 (Bankr.E.D.N.Y.1991). Section § 727(a)(4)(A) seeks to assure that "complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." *In re Tully*, 818 F.2d at 110.

**Conclusion:** Sterman knowingly and fraudulently made material false statements under oath in connection with his bankruptcy case, and for that reason he ought to be denied the benefit of a discharge.

**Findings:** In addition to the factual findings set forth elsewhere in this memorandum, the Court makes the following findings of fact:

Sterman submitted a Statement of Financial Affairs ("Statement") to the Bankruptcy Court in December 1996, which he signed under the pains and penalties of perjury. He intentionally omitted from the Statement material facts regarding his

supposed to be connected with State Street

until he was questioned at his own deposition.

financial status and interests. Sterman neglected to list his affiliation with Mayflower Partners and the State Street Group in his original Statement. He claims that he simply forgot to add those entities, but the claim is incredible. As noted above, Sterman used both Mayflower Partners and the State Street Group actively in 1994 and 1995 to channel payments that he did not want detected in order to avoid the terms of the Court's injunctions. He decided to "work out of" the Mayflower Partners account because Mayflower Partners was not specifically named in the injunctions. He directed that fees he had earned personally be paid to Mayflower Partners. He used State Street Group to pay the IRS. Both entities made payments to Sterman's personal country club account. It is impossible to believe that Sterman simply forgot about the existence of these entities when he submitted his original Statement.

Sterman likewise intentionally omitted to list his continuing interests in the Mayflower Group and AFCP. He failed to declare the existence of the $26,220 Allied Partners dividend or the $75,000 Ray Dirks payment, both received in 1996. He did not disclose his interests in the stock issued to him by the various companies, such as Amnet, Omega Orthodontics, and Epigen, for his services as a director. All these omissions were material to the complete statement of Sterman's assets and business dealings. The omissions were clearly intentional, part of Sterman's calculated effort to play fast and loose not only with his assets and business dealings, but also with both the bankruptcy court and his legitimate creditors. They are adequate reason for denying Sterman a discharge pursuant to section 727(a)(4)(A).

#### 4. *11 U.S.C. § 727(a)(3)*

The plaintiffs also assert that Sterman's failure to maintain proper financial records for the Sterman Company and Mayflower Group in the years prior to bankruptcy have prevented them from ascertaining Sterman's true financial condition and business transactions, and as such should be grounds for a denial of discharge under 11 U.S.C. § 727(a)(3). The plaintiffs have provided insufficient evidence concerning Sterman's record keeping to carry their burden on this issue. Accordingly, § 727(a)(3) does not serve as a basis for denying a discharge.

### B. The Complaint to Reach and Apply Sterman's Interest in Stock

In the collection action that has been pending in this Court since 1992, the plaintiffs brought a petition to reach and apply Sterman's interest in the Mayflower Group and AFCP stock that was transferred as a result of the Glovsky "foreclosure" sales. In substance, the motion seeks an order directing Davstar II, Esther Attar, and Daniel Hoffman to surrender for the benefit of the plaintiffs the shares of stock they respectively hold. For the reasons that follow, however, the Court concludes that the plaintiffs may not reach and apply those assets.

**Conclusion:** Although the "foreclosure" sales were conducted as sham transactions with an actual intent to defraud the plaintiffs, the plaintiffs did not have an equitable lien against the shares of stock by reason of this Court's injunctions, and the plaintiffs have not proved that either transaction was a "fraudulent conveyance" under Massachusetts law.

**Findings and Discussion:** The facts concerning the "foreclosure" sales of the stock are set forth above. As noted, the Court concludes that the sales of the stock were not conducted in good faith and that the purchasers in those sales were not good faith purchasers. Sterman orchestrated the transactions, both setting the prices at which the stock would be sold and finding the buyers. Each "foreclosure" sale was no different in substance, and not very much different in mechanics, from a voluntary sale by Sterman with the approval of a secured creditor who surrenders the security interest

in exchange for payment from the proceeds, just as a person who sells his mortgaged house uses the some of the proceeds to pay the bank and clear the lien. Indeed, Glovsky's testimony indicates that that is what he understood Sterman was doing. The "foreclosure" veneer was a contrivance to accomplish what Sterman was prohibited from doing by the Court's injunctions—alienating assets that might be used to satisfy the plaintiffs' judgment.

Sterman acted with an actual intent to defraud the plaintiffs. Dibo Attar (and his straw Davstar II) and Barry Hoffman participated with Sterman in the transactions as a favor to him, and not in their own interests. They did so knowingly (at the very least they were "willfully blind") and with the purpose of cooperating with him to accomplish his fraud. Esther Attar and Daniel Hoffman, the nominal holders of the stock, were unaware of the transactions at the time they occurred, but since then they also have cooperated in attempting to maintain the legitimacy of the transactions, knowing that they were not legitimate.

### 1. Equitable Lien

 Under Massachusetts law, an injunction prohibiting a debtor from transferring or alienating property entered in an action by a creditor to reach and apply such property operates as an equitable lien against the property. *McCarthy v. Rogers*, 295 Mass. 245, 3 N.E.2d 787, 788 (1936). *See also, In re Ballarino*, 180 B.R. 343, 348 (D.Mass.1995); *In re Borofsky*, 138 B.R. 345, 347 (Bankr.D.Mass.1992). The plaintiffs contend that the Court's injunctions prohibiting Sterman from disposing of his Mayflower Group and AFCP stock gave them an equitable lien against those shares of stock.

The difficulty with their argument is that the injunctions were not entered in an action to reach and apply, and that qualification appears critical. *See In re Osgood*, 203 B.R. 865, 869 (Bankr.D.Mass.1997) ("Only upon both the filing of an action to reach and apply and the issuance of an injunction restraining the transfer of the property sought to be reached and applied does the plaintiff acquire an equitable lien or equitable attachment upon the property."). *See also Borofsky*, 138 B.R. at 347-48. The original complaint in this action was one by Xerox to compel arbitration under the Federal Arbitration Act.[11] It sought neither to reach and apply property nor to enjoin the transfer of property. *See* Compl. at 5. The injunctions were sought after a money judgment had been entered against Sterman and he had given the first signs of trying to avoid satisfying the judgment. The petition to reach and apply now under consideration was filed early in 1998, well after the sale of the Mayflower Group and AFCP stock.[12]

 Accordingly, under Massachusetts law, the injunctions by themselves did not create an equitable lien in favor of the plaintiffs in Sterman's Mayflower Group or AFCP stock. The plaintiffs therefore did not have a security interest in the stock at the time of the "foreclosure" sales, and they were not entitled under Massachusetts law to advance notice of the sales. *See* Mass.Gen.Laws ch. 106, § 9–504(3). The absence of notice to them thus did not by itself have any legal (or equitable) significance, although it helps illuminate the context in which the sales occurred.

### 2. Fraudulent Conveyance

 To prove that a debtor has made a fraudulent conveyance, under Mas-

11. Shortly thereafter, VKM registered a consent judgment in its favor that had been entered in another district. *See* 28 U.S.C. § 1963. The two actions were consolidated in November 1993 and have proceeded under the earlier docket number.

12. It is not necessary to resolve the interesting question whether the conjunction of the later-filed petition to reach and apply with the previously existing injunctions caused an equitable lien to arise at that point in time. At the time of the 1995 "foreclosure" sales of the stock, that conjunction had not yet occurred.

sachusetts law it is not enough to prove only that the debtor transferred property with an actual intent to defraud creditors. There must also be proof that as a result of the conveyance, there was a diminution of the assets of the debtor available to creditors. *Richman v, Leiser,* 18 Mass. App.Ct. 308, 465 N.E.2d 796, 798 (1984). *See also Comjean v. Cruickshank,* 191 B.R. 504, 509 (Bankr.D.Mass.1995).

Thus, the burden lay with the plaintiffs to show not only that Sterman intended to defraud them by alienating property that might have been applied to reduce his debt to them—a proposition which they have proved—but also that if the conveyances had not occurred and Sterman continued to hold the stock, there was sufficient value in it that the plaintiffs would have received something in the event that the shares were sold for the benefit of creditors. The problem is, of course, that the plaintiffs were not Sterman's only creditors, and his debt to the plaintiffs was unsecured. The evidence indicated that there may have been others who held security interests in the shares of stock junior to Glovsky's interest, but senior to the plaintiffs' rights as unsecured creditors. Unfortunately, it is not possible on the evidence to say precisely who had what rights and to what extent. However, at least some evidence indicated that secured interests or liens may have been held by the Boston Private Bank, the IRS, the law firm of Goldstein & Manello, and perhaps the Middlesex Savings Bank. One or more of these creditors may have held a secured position superior to the plaintiffs' claims. On the inconclusive state of the evidence,

there is a sufficient possibility that there were such interests that would have absorbed any residual equity in the stock remaining after Glovsky's interest had been satisfied. It cannot be presumed, and the plaintiffs have not proven, that, after Glovsky's interest, there would have been value available to the plaintiffs. That was a proposition necessary to their fraudulent conveyance claim, and it was up to them to offer enough evidence that the unanswered questions could be answered. They did not carry that burden.

Thus, while the plaintiffs proved that Sterman and his collaborators had the actual intent to defraud creditors, they have nonetheless failed to prove a fraudulent conveyance of the stock under applicable Massachusetts law. Without a fraudulent conveyance, the Court cannot void or otherwise undo the sales—that is, the Court cannot order that the stock be reached and applied to reduce Sterman's indebtedness to them.

### III. *Conclusion and Order for Judgment*

For the foregoing reasons, judgment shall enter in favor of the plaintiffs on their complaint to deny Sterman a discharge in bankruptcy pursuant to 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A).

On the plaintiffs' petition to reach and apply, judgment shall enter in favor of the reach and apply defendants Dibo Attar, Esther Attar, J. Daniel Hoffman, and Davstar II Managed Investments Corporation N.V.

## APPENDIX A

OWNERSHIP CHART

EXHIBIT 271 1-22-99 72-11029

The Mayflower Group owns:

75% of Pilgrim Financial Services

75%

J. Powers owns:

10% of Pilgrim Financial Services

10%

Pilgrim Financial Services owns:

100% of Allied Programs Corp.

15%

Grant owns:

15% of Pilgrim Financial Services

100%

Allied Programs Corp. owns:

25% of High Plains Limited Partnership
90% of Rebound Corp
22.6% of Rebound Programs LLC

High Plains Limited Partnership

25%

90%

Rebound Corp.

75%

22.6%

71.25%

Rebound Programs LLC.

10%

Allied First Class Partners, Inc. owns:

75% of High Plains Limited Partnership
71.25% of Rebound Programs LLC

6.15%

| Shareholder of Allied First Class Partners, Inc. | |
| --- | --- |
| Powers | 5.70% |
| Vara | 10.45% |
| Chaletsky | 7.60% |
| Liss | 7.60% |
| Chrestensen | 6.65% |
| Sterman, Steve | .95% |
| O'Shaughnessy | 5.00% |
| Grant | 26.60% |
| Hoffman, | 18.05% |
| Hoffman, Daniel | 5.70% |
| Attar | 5.70% |
| Total | 100.00% |

Jane O'Shaughnessy owns:

6.15% of Rebound Programs LLC.
10% of Rebound Corp